**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
─────────────────────────────────────────

**OSMOND K. BROWN,**

                                    **Plaintiff,**

        **v.**                                                      **9:08-CV-415**
                                                                    **(FJS/GHL)**

**B. FISCHER, Commissioner, NYS DOCS; J. TAYLOR,**
**Superintendent, Gouverneur Correctional Facility;**
**P. LECONEY, Deputy of Security, Gouverneur**
**Correctional Facility; and J. NOCERA, Inspector**
**General Investigator, NYS DOCS,**

                                    **Defendants.**
─────────────────────────────────────────

**APPEARANCES**                          **OF COUNSEL**

**OSMOND K. BROWN**
**95-B-1958**
Marcy Correctional Facility
P.O. Box 3600
Marcy, New York 13403
Plaintiff *pro se*

**OFFICE OF THE NEW YORK**                **SUSAN C. VON REUSNER, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Osmond K. Brown commenced this action *pro se* pursuant to 28 U.S.C. § 1983,

alleging that Defendants' confiscation of his mail violated his First Amendment rights. *See generally*

Dkt. No. 1 ("Complaint"). Plaintiff also alleged that, in the course of being charged with a

disciplinary infraction and at the subsequent disciplinary hearing, Defendants denied him due process in violation of his Fourteenth Amendment rights. *See id.* Plaintiff seeks substantial monetary relief, injunctive relief, reversal of his Tier III hearing, back pay, and restoration to his "original status prior to Tier III." *See id.* at ¶ 9.

Currently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 28. Defendants assert that Plaintiff cannot substantiate his claims that they violated his rights under the First or Fourteenth Amendments to the United States Constitution; and, even if he could substantiate his claims, qualified immunity precludes liability for damages. *See id.* Plaintiff has responded in opposition to the motion. *See* Dkt. No. 31. Defendants have filed a reply. *See* Dkt. No. 32.


## II. BACKGROUND

### A.    Plaintiff's complaint and procedural history[1]

On January 11, 2008, Defendants Fischer and Taylor had a piece of Plaintiff's outgoing mail, which was addressed to the Internal Revenue Service, opened, read, and confiscated. *See* Complaint at ¶ 6. Plaintiff claims that these actions violated his rights under the First Amendment to the United States Constitution. *See id.* at ¶ 7.

On February 1, 2008, Defendant Nocera issued Plaintiff a misbehavior report, charging him with filing a false tax form and solicitation. *See id.* at ¶ 6. At a Tier III hearing held on February 13, 2008, Defendant Leconey found Plaintiff guilty of both charges. *See id.* at ¶¶ 6, 7. Plaintiff alleges

---

[1] Unless otherwise indicated, the Court bases this factual recitation on the allegations in Plaintiff's complaint.

that Defendant Nocera violated his due process rights because "[t]here was no rule written or posted which prohibited filing of tax form with I.R.S.  The report itself violated 7 NYCRR Ch V and Correction Law § 138."  *See id.* at ¶ 7.  Plaintiff also alleges that Defendant Leconey violated his due process rights when "she found me guilty of a non written non posted rule.  The hearing itself violated 7 NYCRR Ch V, and Correction Law § 138, as well as [Plaintiff's] Due Process."  *See id.* Plaintiff asserts his due process claims pursuant to the Fifth Amendment to the United States Constitution.[2]  *See id*. at ¶ 6.

As a result of Defendants' actions, Plaintiff was sentenced to four months in the Special Housing Unit ("SHU") and "denied the opportunity to file his taxes on time."  *See id*. at ¶¶ 6-7. Plaintiff's complaint requests reversal of the Tier III hearing, back pay, restoration of Plaintiff's "original status prior to Tier III," $150 million in compensatory and punitive damages, and a preliminary injunction.  *See id.* at ¶ 9.  In response to a written waiver in which Plaintiff waived "for all times all claims in this action relating to disciplinary sanctions affecting the duration of his confinement in order to proceed with his claims challenging the sanctions affecting the conditions of his confinement," the Court dismissed "all claims set forth in the complaint relating to disciplinary sanctions imposed on Plaintiff that affect the duration of his confinement."[3]  *See* Dkt. No. 7 at 2.

---

[2] To the extent that Plaintiff asserts due process claims under the Fifth Amendment, the Court notes that the Fifth Amendment applies only to actions against the federal government.  *See Betts v. Brady*, 316 U.S. 455, 462 (1942) (holding that "[d]ue process of law is secured against invasion by the federal Government by the Fifth Amendment, and is safeguarded against state action in identical words by the Fourteenth [Amendment]"), *overruled on other grounds by Gideon v. Wainwright*, 372 U.S. 335 (1963).  The Court will therefore consider Plaintiff's due process claims as if he had asserted them under the Fourteenth Amendment.

[3] Since Plaintiff had not demonstrated that his loss of good time credits had been invalidated, the "favorable termination" rule of *Heck v. Humphrey*, 512 U.S. 477 (1994), would bar prosecution of
(continued...)

Defendants filed an answer to Plaintiff's complaint, in which they generally denied its material allegations and interposed various defenses. *See* Dkt. No. 10. Following the close of discovery, Defendants moved for summary judgment dismissing Plaintiff's complaint in its entirety. *See* Dkt. No. 28.

**B.     Defendants' summary judgment motion**

In their summary judgment motion, Defendants argue that (1) Plaintiff cannot establish a protected right to support his claim that they violated his First Amendment rights because Plaintiff has no First Amendment right to file false or misleading tax claims; (2) Defendants' action regarding Plaintiff's mail were justified by a legitimate penological interest; (3) Plaintiff's due process claim is wholly without merit; and (4), even if Plaintiff could prevail on any of his constitutional claims, Defendants are entitled to qualified immunity. *See* Dkt. No. 28-6, Memorandum of Law.

In response, Plaintiff argues that the Court should deny Defendants' motion for summary judgment because there are material issues of fact to be resolved. *See* Dkt. No. 31 at 2. Plaintiff contends that he did not attempt to file a false or fraudulent income tax return. *See id*. Plaintiff based his request for a tax refund upon information contained in the July/August 2006 issue of *American Bulletin*, information which he believed to be true. *See id*. Further, Plaintiff argues that (1) Defendants violated his First Amendment rights when they opened his privileged mail, which was addressed to the IRS, outside of his presence; (2) the opening of his privileged mail was not

---

[3](...continued)
Plaintiff's claims relating to his disciplinary sentence unless Plaintiff indicated that he was willing to forever forego a challenge to the loss of good time alleged in the complaint. *See Peralta v. Vasquez*, 467 F.3d 98, 104 (2d Cir. 2006).

supported by a legitimate penological interest; (3), to the extent that any of the tax forms may have

contained false or fraudulent information, the IRS was "better skilled" at making that determination;

and (4) Defendants did not follow the procedures set forth in DOCS Directive 4421 when they

opened his privileged mail because Defendant Taylor "never received nor produced written

authorization" to open the mail. *See* Dkt. No. 31 at 7-12. Plaintiff also claims that (1) Defendants

Nocera and Leconey violated New York Correction Law § 138 and New York State regulations by,

respectively, charging Plaintiff with and finding him guilty of conduct that "no inmate could have

known was against prison rules;" (2) Defendants Fischer and Taylor denied Plaintiff due process by

failing to provide him with notice that his conduct was prohibited; (3) the rules under which he was

disciplined were vague; (4) Defendant Leconey denied him due process at his Tier III hearing

because she had been involved in the underlying investigation and "had prior knowledge of the

incident being classified as a tax scam;" (5) the misbehavior report was defective as it did not

"specify the particulars of the alleged incident of the misbehavior involved;" (6) the result of his Tier

III hearing was predetermined; (7) his disciplinary conviction is not supported by the evidence; and

(8) Defendants Fischer and Taylor failed to correct on appeal the fact that Plaintiff had been denied

due process. *See id*. at 13-22.

In reply, Defendants assert that, because Plaintiff failed to refute any of the facts set forth in

their Statement of Material Facts and because those facts are supported by cited record evidence, the

Court should deem that Plaintiff has admitted the facts set forth in Defendants' Statement of Material

Facts. *See* Dkt. No. 32 at 1. Defendants also state that, because Plaintiff's response to the motion

"merely reiterates his allegations, and does not raise additional issues," Defendants will otherwise

rely on their original motion papers. *See id.*

**C.    Plaintiff's failure to comply with Local Rule 7.1(a)(3)**

Before setting forth the relevant facts, as a preliminary matter, the Court will address Defendants' argument that Plaintiff did not strictly comply with the requirements of Local Rule 7.1 when he responded to their motion for summary judgment and that, therefore, the Court should accept as true the facts set forth in Defendants' Rule 7.1 Statement. *See* Dkt. No. 32.

Local Rule 7.1(a)(3) of the Northern District of New York provides that a motion for summary judgment must include a Statement of Material Facts ("Rule 7.1 Statement").[4] *See* L.R. 7.1(a)(3). The Rule 7.1 Statement "shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." *Id.* Once the moving party submits a properly supported Rule 7.1 Statement, Rule 7.1 requires that the party opposing summary judgment file a response to the moving party's Rule 7.1 Statement. *See id.* The non-movant's response shall mirror the movant's Rule 7.1 Statement "by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs." *Id.*

By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."

---

[4] Rule 7.1(a)(3) also requires the moving party to advise a *pro se* litigant of the consequences of his failure to respond to a motion for summary judgment. Defendants' notice of motion specifically advised Plaintiff of the requirements of Local Rule 7.1(a)(3) and the consequences of failing to respond to their Rule 7.1(a)(3) Statement. *See* Dkt. No. 28-1.

L.R. 7.1(a)(3).  Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor,

Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond.  *See*

*N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648 (2d

Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule

7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the

non-movant submitted a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials

of [movant's] factual assertions and failed to include any record citations"); *Gubitosi v. Kapica*, 154

F.3d 30, 31 n.1 (2d Cir. 1998) (per curiam) (accepting as true material facts contained in unopposed

local rule statement of material facts (citation omitted)); *Meaney v. CHS Acquisition Corp.*, 103 F.

Supp. 2d 104, 109 (N.D.N.Y. 2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where

non-movant's response "failed . . . to controvert with specificity the facts set forth" in the moving

party's Rule 7.1 Statement and did not cite specifically to the record); *McKnight v. Dormitory Auth.*

*of State of N.Y.*, 189 F.R.D. 225, 227 (N.D.N.Y. 1999) ("deem[ing] the portions of Defendants'

7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted").

        In this case, Plaintiff responded to Defendants' summary judgment motion and filed what he

refers to as "Plaintiff's Statement of Disputed Factual Issue," wherein he listed what he considered to

be five issues of fact.  *See* Dkt. No. 31 at 1.  Indeed, Plaintiff has failed to provide an opposing Rule

7.1 Statement specifically controverting Defendants' factual assertions **in matching numbered**

**paragraphs with specific citations to the record**.  Therefore, the Court could accept all of the facts

set forth in Defendants' Rule 7.1 Statement as true to the extent that they are supported by the record.

It is evident, however, from Plaintiff's submission that he at least attempted to respond to

Defendants' Rule 7.1 Statement.  *See* Dkt. No. 31 at 1.  It is also clear from that submission that

Plaintiff claims that questions of fact exist as to the following assertions set forth in Defendants'

Rule 7.1 Statement: (1) Plaintiff listed his mother's address on his IRS forms in "an attempt to

conceal from the IRS the fact that plaintiff is incarcerated and therefore very unlikely to have a

source of income or assets sufficient to generate" such a large tax refund and (2) Plaintiff submitted

a "fraudulent US income tax return."  *Compare* Dkt. No. 28-3 at ¶ 19 *with* Dkt. No. 31 at ¶¶ 2, 4.  In

light of this, and based upon the broad discretion afforded the Court and the deference afforded to

*pro se* plaintiffs, the Court will consider the aforesaid portions of Plaintiff's Rule 7.1 Response in

ruling on this motion.[5]  In light of this, and based upon the broad discretion afforded the Court with

respect to enforcing local rules[6] and the deference afforded to *pro se* plaintiffs, the Court finds that

Plaintiff intends to contest the aforesaid portions of Defendants' Rule 7.1 Statement.  Therefore, the

Court will consider Plaintiff's opposing "Rule 7.1 Statement" to the extent that the contents therein

are specific.  As to the remaining portions of Plaintiff's opposing "Rule 7.1 Statement," including

Plaintiff's broad statement that he denies "all other parts," *see* Dkt. No. 31 at ¶ 5, the Court will not

consider those parts because they either do not clearly match any of the statements set forth in

---

[5] Plaintiff also contends that Defendants' reference to a press release from the United States Attorney for the Northern District of New York dated June 5, 2008, is wholly irrelevant to the present action.  *See* Dkt. No. 31 at 1; *see also* Dkt. No. 28-2 ("Reusner Aff."), Exhibit "W" (DOJ Press Release dated June 5, 2008).  The Court agrees and, in fact, finds the submission to be misleading to the extent that Defendants' Rule 7.1 Statement, by omission, infers that the tax fraud referenced in the press release is somehow connected to the alleged tax fraud in this action, which it is not.  *See* Dkt. No. 28-3, at ¶ 27.  Therefore, the Court will disregard the press release.

[6] "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules [including a local rule requiring a response to a statement of material facts]."  *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted) (affirming district court's exercise of discretion to overlook *pro se* civil rights plaintiff's failure to comply with local rule requiring response to statement of material facts on defendant's motion for summary judgment).

Defendants' Rule 7.1 Statement or they consist of general denials.

Despite the foregoing, "[i]f the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, 'then summary judgment must be denied *even if no opposing evidentiary matter is presented*.'" *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quotation and other citation omitted). "Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [statement of material facts]. It must be satisfied that the citation to evidence in the record supports the assertion." *Id.* (citation omitted).

The Court also notes that, during a summary judgment analysis, it will treat any verified complaint that the plaintiff has filed as an affidavit.[7] *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that "a verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment" (citation omitted)); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that the plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) (holding that "[a] verified complaint is to be treated as an affidavit for summary judgment purposes").

**D.    Summary of facts taken from the record**

In early 2008, the Gouverneur Correctional Facility ("GCF") mailroom received an unusual amount of inmate mail addressed to the Internal Revenue Service ("IRS"). All of the mail

---

[7] Plaintiff signed his complaint "under penalty of perjury." *See* Complaint at ¶ 9.

was from different inmates, but each envelope was addressed with the same handwriting. *See* Dkt. No. 28-4 ("Taylor Aff.") at ¶ 5. Around the same time, Defendant Superintendent Taylor was informed that a publication, entitled *The American Bulletin*, was circulating in the prison and advocated the filing of fraudulent tax returns as a form of protest against what the authors believed was a "criminal judicial system."[8] *See id*. *The American Bulletin* circulating in GCF at the time outlined the process by which inmates could claim large tax refunds from the IRS based on withholding credits attributed to "appearance bonds" allegedly created in the inmate's name. *See* Taylor Aff. at ¶¶ 5, 7-9; *see also* Dkt. No. 28-2 ("Reusner Aff."), Exhibit "R" (*The American Bulletin* July/August 2006 issue).

Based on the sharp increase in inmate mail to the IRS and the circulation of *The American Bulletin* in the prison system, as well as Defendant Taylor's personal experience with a similar incident of inmate tax fraud at Camp Gabriels, the prison where he had previously served as Superintendent, Defendant Taylor became concerned that inmates at GCF were conspiring to commit tax fraud. *See* Taylor Aff. at ¶¶ 6-9. Defendant Taylor contacted John Crowley, the New York State Department of Correctional Services ("DOCS") Inspector General Investigator who had investigated an inmate tax scam at Camp Gabriels when Defendant Taylor was the Superintendent there. *See id*. at ¶ 8. Investigator Crowley provided Defendant Taylor with additional details of the tax scheme, which included submission of IRS forms 1099INT, 1099OID, 1096, 1040, as well as letters to District Attorneys requesting an IRS filing based on the inmate's indictment number and social security number. *See id*. Defendant Taylor also learned from Investigator Crowley that the

---

[8] Plaintiff asserts that he had no knowledge that the tax returns that *The American Bulletin* advocated were fraudulent; and, in fact, he believed the information contained therein to be true. *See* Dkt. No. 31 at ¶ 4.

scam was based on false withholding credits attributed to "appearance bonds" and involved the filing

of frivolous or false returns and claims using Tax Form 1099-OID, Original Issue Discount forms.

*See id*.  The tax scheme that Investigator Crowley described to Defendant Taylor was nearly identical

to the tax scheme advocated in the July/August 2006 issue of *The American Bulletin* publication

which was circulating in GCF at this time.  *See id*.

   After his conversation with Investigator Crowley, Defendant Taylor had a "heightened belief"

that at least ten or more inmates at GCF were involved in a similar IRS tax scheme and were

possibly filing tax returns claiming "appearance bond tax refunds" as advocated in *The American

Bulletin*.  *See* Taylor Aff. at ¶ 9.  Defendant Taylor also concluded that it would be necessary to open

and inspect inmate mail addressed to the IRS in order to determine if an inmate tax scheme was in

fact in operation at GCF.  *See id*.  Prior to confiscating and opening any of the inmates' envelopes

addressed to the IRS, Defendant Taylor reviewed DOCS Directive 4421[9] governing privileged

correspondence, namely Authorization to Read Privileged Mail.  *See* Taylor Aff. at ¶ 10.  As

suggested in DOCS Directive 4421, Defendant Taylor contacted DOCS Counsel's Office and spoke

to Associate Counsel Thomas Goetz, who advised Defendant Taylor that he had sufficient reason to

open and review the contents of the envelopes addressed to the IRS.  *See id*. at ¶ 13.  Defendant

Taylor prepared an authorization to open the suspected envelopes and then personally opened the

envelopes.  *See id*. at ¶14.  Defendant Taylor found that the envelopes contained the IRS forms that

Investigator Crowley had described to him, including IRS forms 1099-INT, 1099-OID, 1096, 1040,

as well as letters to district attorneys requesting an IRS filing based on the inmate's indictment

---

   [9] This Directive is set forth in section 721.3(c) of the New York Compilation of Codes, Rules
and Regulations.

number and social security number.  *See id*.  All of the tax filings sought an IRS refund in excess of

several hundreds of thousand dollars.  *See id.*  Specific to Plaintiff, prior to opening his mail

addressed to the IRS, Defendant Taylor followed the procedures set forth in DOCS Directive 4421.

*See* Taylor Aff. at ¶ 19.  Plaintiff's mail addressed to the IRS included a 1040 tax return claiming

income in 2007 of $144,500,000.00 labeled as "Appearance Bond."  *See id*.  Plaintiff's envelope also

contained a 1096 form claiming that federal income tax had been withheld on Plaintiff's 2007

income in the sum of $144,500,000.00.  *See id*.  Finally, the envelope included a 1099-OID form,

which claimed that District Attorney Frank J. Clark withheld a total of $144,500,000.00 in federal

income tax as a "holder in due course" for Plaintiff.  *See id*.  Defendant Taylor noted that Plaintiff

listed his mother's address as his home address, even though Plaintiff was serving a life sentence for

murder, which Defendant Taylor believed to be Plaintiff's attempt to conceal from the IRS the fact

that he was incarcerated and not generating income.[10]  *See id*. at ¶ 20.

Defendant Taylor contacted the DOCS Inspector General's Office with the information that

he had accumulated, and the Inspector General's Office established a case.  *See* Taylor Aff. at ¶ 15.

On January 22, 2008, Deputy Inspector General Ferro assigned Inspector Nocera to investigate a

possible GCF inmate conspiracy to commit tax fraud.  *See* Dkt. No. 28-5 ("Nocera Aff.") at ¶ 9.

On January 30, 2008, Defendant Taylor informed Plaintiff by letter that Plaintiff's tax returns

had been confiscated in accordance with Department Directive 4421, Privileged Correspondence,

and were the subject of a joint investigation between DOCS and the IRS relating to a possible

violation of Federal Law.  *See* Taylor Aff. at ¶ 21; Reusner Aff., Exhibits "F" & "I" (Memoranda

---

[10] Plaintiff disputes the fact that using his mother's address on his tax return was a false or fraudulent statement because he argues that it is his "home" address.  *See* Dkt. No. 31 at 1, ¶ 2.

from Superintendent Taylor to Plaintiff). On January 30, 2008, Defendant Taylor informed the

Inmate Liaison Committee at GCF of the Inspector General's investigation into a possible inmate

IRS tax scam. *See* Taylor Aff. at ¶16; Reusner Aff., Exhibit "J" (Inmate Liaison Committee meeting

minutes).

In his affidavit, Defendant Nocera sets forth his credentials as an Investigator with the DOCS

Inspector General's Office and includes a description of the functions of and procedures that the

office follows when conducting an investigation. *See* Nocera Aff. at ¶¶ 1-5. Between January 2008

and June 2009, Defendant Nocera worked closely with the staff at GCF and was in contact with the

Criminal Investigations Division of the IRS to investigate Defendant Taylor's concern that GCF

inmates were attempting to submit fraudulent tax returns to the IRS. *See id.* at ¶ 10. As part of his

investigation, Defendant Nocera reviewed the mail addressed to the IRS that was confiscated from

fourteen different inmates and that Defendant Taylor gave to him as suspicious. *See* Nocera Aff. at

¶ 11. Defendant Nocera concluded that each of the envelopes contained documents consistent with

the tax scheme advocated in the issue of *The American Bulletin* that was circulating around GCF.

*See id.*. Defendant Nocera then consulted with IRS Criminal Investigation Division Special Agent

Kelly Ewald regarding his concern that these GCF inmates were conspiring to defraud the IRS by

filing fraudulent or misleading tax returns. *See id.* at ¶ 12. Based on his conversations with IRS

Special Agent Ewald, Defendant Nocera determined that the inmates' tax forms "all had the

hallmarks of a fraudulent tax return and was [sic] most likely part of a prison-based tax scam to

defraud the Internal Revenue Service." *See id.*

The factors on which Defendant Nocera relied to make this determination with respect to the

documents confiscated from Plaintiff included the following: (1) the excessive amount of the tax

refunds demanded; (2) the lack of supporting documentation to substantiate a tax refund demand of that amount; (3) the fact that Plaintiff had listed a private address instead of his current correctional facility address; and (4) the use of tax forms 1099-OID and 1096 to claim large withholding credits attributed to appearance bonds posted as a result of Plaintiff's incarceration. *See* Nocera Aff. at ¶ 13. The envelope confiscated from Plaintiff specifically contained a 1040 tax return claiming that, in 2007, Plaintiff had $144,500,000.00 in income which Plaintiff labeled as an "Appearance Bond." *See id.* at ¶ 14; *see also* Reusner Aff., Exhibit "F" (Confiscated Mail). The envelope also contained a 1096 form, which claimed that $144,500,000.00 in federal income tax had been withheld from Plaintiff's income in 2007. *See* Nocera Aff. at ¶ 14. Additionally, Plaintiff's envelope included a 1099-OID form claiming that District Attorney Frank J. Clark withheld $144,500,000.00 in federal income tax as a "holder in due course" for Plaintiff. *See id.*; *see also* Reusner Aff., Exhibits "G" & "H" (letters from Plaintiff to District Attorney Clark). Defendant Nocera noted that Plaintiff listed his mother's address as his home address even though Plaintiff was serving a life sentence for murder. *See* Nocera Aff. at ¶ 15. Defendant Nocera believed listing his mother's address was Plaintiff's attempt to conceal from the IRS the fact that Plaintiff was an inmate and therefore unlikely to have income or assets sufficient to justify a tax refund of the amount demanded. *See id.* Based on his experience investigating inmate paper fraud and inmate tax fraud, as well as his own independent research on "appearance bond refund" schemes, Defendant Nocera concluded that Plaintiff's tax returns "had all the hallmarks of fraud and attempting to solicit money from the IRS to which Plaintiff was not entitled."[11]  *See* Nocera Aff. at ¶ 16.

---

[11] Plaintiff contends that he did not "attempt or intent to file false, misleading or frivolous tax claims." *See* Dkt. No. 31 at 1, ¶ 4.

After completing his investigation, Defendant Nocera issued Plaintiff a misbehavior report, charging Plaintiff with violating Rule 103.20 ("Soliciting") and Rule 107.20 ("Misleading/False Statements").  *See id.* at ¶ 17; Reusner Aff., Exhibit "K" (Plaintiff's Misbehavior Report).[12]

On February 11, 2008, hearing officer Defendant Leconey convened a Tier III hearing to address the charges against Plaintiff.  *See* Dkt. No. 28-17 (Tier III transcript).  Prior to the hearing, Plaintiff was offered an assistant to help him prepare for the hearing and received assistance.  *See id.* at 1. At the hearing, Plaintiff appeared, was allowed to call witnesses, present evidence, and testify on his own behalf.  *See id. generally*  Plaintiff called Defendant Nocera to testify at the hearing and was given the opportunity to question him.  *See id.* at 2, 5-8.  At the close of the hearing, Plaintiff indicated that he had no further witnesses or testimony.  *See id.* at 9.  After sentencing, Plaintiff was advised of his right to appeal.  *See id.* at 10-11.

Defendant Nocera testified at the hearing that the IRS had informed him that it was aware of and investigating a common scam that involved filing for tax refunds based on appearance bonds.  *See* Tier III Transcript at 6-8.  Defendant Leconey found Plaintiff guilty of both charges of

---

[12] Defendants' Rule 7.1 Statement makes frequent reference to a Confidential Inspector General's Office Investigative Report.  *See* Reusner Aff. (referencing Exhibit "Z").  Defendants previously requested, on notice to Plaintiff, permission to submit a copy of the Inspector General's Investigative Report to the Court traditionally, under seal, and for *in camera* review only.  *See* Dkt. No. 27.  In support of that application, Defendants asserted that the report was confidential in nature because it included the internal deliberations of the Inspector General's Office, as well as statements and admissions that other inmates and informants had made, and it referenced an ongoing IRS investigation.  *See id.*  The Court granted that application by Text Order dated July 27, 2009.  Although the Court notes that it has reviewed this *in camera* submission for background information, it did not rely on it, and the information provided therein was not necessary in deciding Defendants' summary judgment motion.  In fact, the Court notes that it would have reached the same result without resort to the *in camera* submission.  The Court further notes that, except for the names of other inmates, Defendant Nocera made extensive and detailed disclosure to Plaintiff of the underlying facts included in the Investigative Report.  *See generally* Nocera Aff.

misbehavior and sentenced Plaintiff to eight months in the Special Housing Unit ("SHU"), eight

months loss of privileges, and eight months loss of good time.  *See id.* at 9.  Plaintiff's sanction was

later reduced on appeal to four months in SHU, four months loss of privileges, and two months loss

of good time.  *See* Reusner Aff., Exhibit "L" (Review of Superintendent's Hearing at 1).

    On February 10, 2008, Plaintiff filed his first inmate grievance, GOV-13672-08, in which he

protested Defendant Nocera's misbehavior report because it violated New York Corrections Law

§ 138.  *See* Reusner Aff., Exhibit "N" (Inmate Grievance GOV-13672-08).  The Inmate Grievance

Review Committee ("IGRC") unanimously dismissed the first grievance.[13]  *See id.*  On March 11,

2008, Plaintiff filed his second inmate grievance, GOV-13719-08, entitled "Confiscated Mail

Violates My Rights." On March 14, 2008 the IGRC denied the second grievance because it

determined that Plaintiff's mail had been opened in accordance with DOCS Directives 4421 and

4422.  *See* Reusner Aff., Exhibit "O" (Inmate Grievance GOV-13719-08).  Defendant Taylor

affirmed the IGRC decision with respect to the second grievance.  *See id.*  On March 15, 2008,

Plaintiff filed his third inmate grievance, GOV-13745-08, complaining that his correspondence to

the IRS was being opened and read without prior authorization.  *See* Reusner Aff., Exhibit "P"

(Inmate Grievance GOV-13745-08).  The IGRC denied the third grievance because it determined

that Plaintiff's IRS form was properly withheld pursuant to DOCS Directives 4421 and 4422 and that

nothing more was confiscated from Plaintiff's mail.  *See id.* at 9.  The Superintendent and the Central

Office Review Committee ("CORC") affirmed this IGRC decision on appeal.  *See id.* at 1, 5.  On

March 24, 2008, Plaintiff filed a fourth inmate grievance, GOV-13770-08, demanding a written

---

[13] The IGRC dismissed this grievance because the complaint was "based solely on a Misbehavior Report;" and, therefore, Plaintiff's complaint should have been addressed in the context of his disciplinary proceeding.  *See* Reusner Aff., Exhibit "N"at 3.

statement from the IRS Special Agent who cooperated with Defendant Nocera's investigation into Plaintiff's potential tax fraud. *See* Reusner Aff., Exhibit "Q" (Inmate Grievance GOV-13770-08). The IGRC denied Plaintiff's fourth grievance and advised Plaintiff to file a Freedom of Information Law ("FOIL") request, noting that the IGRC "cannot compel the named investigator to supply a statement to [Plaintiff]." *See id*. at 6. The Superintendent and CORC affirmed the IGRC's decision on Plaintiff's fourth grievance on appeal. *See id*. at 1.

The prison authorities forwarded all of tax documents that they confiscated from inmates, including Plaintiff's tax returns, to Special Agent Ewald for review and investigation. *See* Nocera Aff. at ¶ 20. Between 2007 and 2009, Defendant Nocera is personally aware of at least four or five investigations statewide in which the Inspector General's Office cooperated with the IRS or other officials to investigate prison-based schemes to defraud the IRS of tax revenues. *See id.* at ¶ 21.


## III. DISCUSSION

### A.    Summary judgment standard

A court may grant summary judgment when the moving party carries its burden of showing the absence of a genuine issue of material fact. *See* Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Wright v. Genovese*, No. 9:07-CV-0473, — F. Supp. 2d —, 2010 WL 890962, *7 (N.D.N.Y. Mar. 9, 2010) (citation omitted). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86

(1986) (citations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and "identifying the portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *See Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S., at 323, 106 S. Ct. at 2548) (other citations omitted). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *See id*.

If the moving party satisfies its burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *See id*. A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, "while a court 'is not required to consider what the parties fail to point out,'" the court may "in its discretion opt to 'conduct an assiduous review of the record'" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

**B.     Interference with mail**

*1. First Amendment*

Plaintiff challenges Defendants' interference with and confiscation of his mail under the First

Amendment. *See generally* Complaint.  "'[C]onvicted prisoners do not forfeit all constitutional

protections by reason of their . . . confinement in prison.'"  *O'Lone v. Estate of Shabazz*, 482 U.S.

342, 348 (1987) (quotation and other citations omitted).  Nonetheless, the Supreme Court has

acknowledged that "[t]he fact of confinement and the needs of the penal institution impose

limitations on constitutional rights . . . ."  *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433

U.S. 119, 125 (1977).  Under the First Amendment, prisoners enjoy the right "to 'the free flow of

incoming and outgoing mail.'"  *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (quoting *Davis*

*v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).  Generally, "courts have consistently afforded . . .

greater protection to outgoing mail than to incoming mail."  *Davis v. Goord*, 320 F.3d 346, 351 (2d

Cir. 2003) (citations omitted).  This is because "[t]he implications of outgoing correspondence for

prison security are of a categorically lesser magnitude than the implications of incoming materials."

*Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).

"Restrictions on prisoners' mail are justified only if they 'further[ ] one or more of the

substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater

than is necessary or essential to the protection of the particular governmental interest involved.'"

*Davis,* 320 F.3d at 351 (quotation omitted); *see also United States v. Workman*, 80 F.3d 688, 699 (2d

Cir. 1996) (holding that the right to the free flow of mail may give way to the legitimate penological

interest of prison officials to monitor mail to ensure order and security in the prison by preventing

illegal activities).  The Second Circuit has held that "'where good cause is shown, outgoing mail can

be read' without violating inmates' First Amendment rights."  *Workman*, 80 F.3d at 698 (quotation

omitted).

Courts analyze regulations that infringe on a prisoner's right to the free flow of mail under the

standards set forth in *Turner v. Safely*, 482 U.S. 78 (1987).  Under *Turner*, a prison regulation

infringing on an inmate's constitutional right is valid so long as the regulation is "reasonably related

to legitimate penological interests."  *Turner*, 482 U.S. at 89; *see also Dumatef v. Hollins*, 297 F.3d

108, 112 (2d Cir. 2002) (holding that "restrictions that implicate prisoners' constitutional rights may

be upheld if they are 'reasonably related to legitimate penological interests'" (quotation and other

citation omitted)).  In *Turner*, the Supreme Court stated that the reasonableness standard

> is necessary if "prison administrators . . ., and not the courts, [are] to
> make the difficult judgments concerning institutional operations." . . .
> Subjecting the day-to-day judgments of prison officials to an inflexible
> strict scrutiny analysis would seriously hamper their ability to
> anticipate security problems and to adopt innovative solutions to the
> intractable problems of prison administration.  The rule would also
> distort the decisionmaking process, for every administrative judgment
> would be subject to the possibility that some court somewhere would
> conclude that it had a less restrictive way of solving the problem at
> hand.  Courts inevitably would become the primary arbiters of what
> constitutes the best solution to every administrative problem, thereby
> "unnecessarily perpetuat[ing] the involvement of the federal courts in
> affairs of prison administration." . . .

*Turner*, 482 U.S. at 89 (internal quotations omitted).

In analyzing prison policies under *Turner*, the burden is on the plaintiff to show that the

policy is unreasonable.  *See Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (citation omitted);

*Giano v. Senkowski*, 54 F.3d 1050, 1054 (2d Cir. 1995).  "The [Supreme] Court has counseled

judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts

-20-

are ill equipped to deal with the increasingly urgent problems of prison administration and reform.'"

*Giano*, 54 F.3d at 1053 (quoting *Turner*, 482 U.S. at 84, 107 S. Ct. at 2259); *see also Rodriguez v.*

*Ames*, 224 F. Supp. 2d 555, 564 (W.D.N.Y. 2002) (holding that courts should give considerable

deference "'to the determinations of prison administrators who, in the interest of security, regulate

the relations between prisoners and the outside world'" (quoting [*Thornburgh*, 490 U.S.] at 407-08,

109 S. Ct. 1874)).

The *Turner* Court further noted that the reasonableness inquiry necessarily involves the

balancing of two competing principles: (1) an individual does not surrender the protections that the

Constitution provides him when he passes through the prison gate, and (2) courts must give prison

officials substantial deference in the administration of their institutions.  *See Turner*, 482 U.S. at 84-

85.  The Supreme Court set forth four factors for courts to consider in determining whether a prison

regulation is rationally related to a legitimate penological interest: (1) whether there is a rational

connection between the restriction and the penological interest used to justify it; (2) whether "other

avenues" are available to the inmate to exercise the right; (3) whether accommodation of the right

will have an adverse impact on guards, other inmates and prison resources in general; and (4)

whether obvious, easy alternatives to the restriction exist.  *See Turner*, 482 U.S. at 89-91.

In this action, Plaintiff challenges the interference with his outgoing mail and claims that

Defendants Fischer and Taylor violated his First Amendment rights when they opened and then

confiscated mail that he had addressed to the IRS.  *See* Complaint at ¶¶ 6, 7.

"'It is well settled in this Circuit that personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Farrell v.*

*Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quotation omitted).  In addition, personal liability under

§ 1983 cannot be imposed upon a state official based on a theory of *respondeat superior*. *See, e.g.,*
*Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (holding that "supervisor liability in a § 1983
action depends on a showing of some personal responsibility, and cannot rest on *respondeat*
*superior*" (citation omitted)).  In this case, there is absolutely nothing in the record to demonstrate
that Defendant Fischer was in any way personally involved with the opening or confiscation of
Plaintiff's mail.  Moreover, at his deposition, Plaintiff indicated that his sole basis for suing
Defendant Fischer rested on Defendant Fischer's failure to correct due process violations that
Plaintiff suffered after Plaintiff notified Defendant Fischer of those violations through an appeal or
by sending him letters.[14]  *See* Dkt. No. 28-28, Plaintiff's Deposition Transcript at 25-31.  Since no
reasonable factfinder could conclude that Defendant Fischer violated Plaintiff's First Amendment
rights by opening or confiscating Plaintiff's mail, the Court grants Defendants' motion for summary
judgment and dismisses Plaintiff's First Amendment claim against Defendant Fischer.

Defendant Taylor states that he opened Plaintiff's mail addressed to the IRS in accordance
with DOCS Directive 4421.  *See* Taylor Aff. at ¶¶ 10-14.  Defendant Taylor states that, prior to
opening Plaintiff's mail, he reviewed DOCS Directive 4421.  *See* Taylor Aff. at ¶ 10.  DOCS
Directive 4421, which governs privileged correspondence, provides that privileged mail may be
opened outside the presence of the inmate if the Superintendent "has reason to believe that the
provisions of this or any directive or rule or regulation have been violated, that any applicable state
or federal law has been violated, or that the content of such correspondence threatens the safety,
security, or good order of a facility."  *See* Ruesner Aff., Exhibit "D" (DOCS Directive 4421
§ 721.3(c) (1)-(4)).  The Directive provides that, if the Superintendent authorizes an inmate's

---

[14] The Court will address this claim separately *infra*.

privileged mail to be read, only the Superintendent, a deputy Superintendent (DSS), or Central

Office Staff may read it. *See id*. § 721.3(c)(2). The Superintendent is "advised to consult" with

DOCS office of counsel before authorizing the opening of privileged mail under this Directive. *See*

*id*. If, after opening and reading the privileged correspondence, the Superintendent "has reason to

believe that the provisions of this or any directive or rule or regulation have been violated, that any

applicable state or federal law has been violated, or that the content of such correspondence threatens

the safety, security, or good order of a facility," the correspondence may be confiscated and the

inmate must be given written notice of the confiscation and the reasons therefore, unless to do so

would be inconsistent with the need to safeguard an investigation. *See id*. § 721.3(c)(3).

      Defendant Taylor contacted the DOCS Counsel's Office and spoke to Associate Counsel

Thomas Goetz, who advised him that he had sufficient reason to open the mail in question. *See*

Taylor Aff. at ¶ 13. Defendant Taylor states that he prepared an authorization to open Plaintiff's

outgoing mail addressed to the IRS because he believed that several inmates, including Plaintiff,

were attempting to file false or fraudulent tax returns with the IRS. *See id.* at ¶¶ 9-12, 14. Defendant

Taylor states that his belief was based on his prior experience with a similar tax fraud scheme at

another correctional facility; the fact that a copy of *The American Bulletin*, which described in detail

the steps to collect enormous amounts of money from the IRS based upon non-existent withholding,

was circulating among the inmates; the increase in outgoing inmate mail addressed to the IRS; and

the fact that the outgoing IRS envelopes were all written in the same handwriting despite coming

from different inmates. *See id*. at ¶¶ 5-9. Defendant Taylor's suspicion that a tax fraud scheme was

ongoing heightened after he spoke with Inspector General Investigator Crowley, who confirmed that

he had investigated a tax fraud scheme at Camp Gabriels identical in nature to the one that *The*

*American Bulletin* that was circulating at GCF advocated.  *See id.* at ¶¶ 8, 9.

Defendant Taylor's suspicion was based on credible evidence that inmates might be involved in fraudulent or criminal activity and, therefore, provided a legitimate penological basis for opening Plaintiff's mail.  *See Duamutef*, 297 F.3d at 112 (noting that it "has repeatedly found '[w]ithout doubt, . . . a valid, rational connection between the decision to impose a watch on [a prisoner's] mail and the desire to ensure the good order of the prison and the rehabilitation of prisoners by preventing [a prisoner] from engaging in illegal activities while incarcerated'" (quotation and other citations omitted)); *see also Workman*, 80 F.3d at 699 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 411-12, 109 S. Ct. 1874, 1880, 104 L. Ed. 2d 459 (1989), for the proposition that "[t]he investigation and prevention of ongoing illegal activity constitute legitimate penological objectives"); *United States v. Felipe*, 148 F.3d 101, 108 (2d Cir. 1998) ("In upholding the officials' actions [with respect to inmates' mail, the Second Circuit has] said that the investigation and prevention of illegal activity among inmates is a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner." (citation omitted)).  Since Defendant Taylor believed that Plaintiff, along with a number of other inmates, was using the prison mail system to commit fraud upon the Federal government, his decision to open Plaintiff's privileged mail was rationally related to his legitimate interest of preventing future criminal activity.[15]

As to the second *Turner* factor, in determining whether the inmate has an adequate alternative means of exercising the right,

the [Supreme] Court has instructed that "'the right' in question must be

---

[15] The Second Circuit has stated that "there is ample case law holding that the connection between the legitimate government interest and the prison's policy is valid and rational without the need for extensive factual 'proof' of the link . . . ."  *Giano*, 54 F.3d at 1055.

viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 418. The focus remains whether there are alternative means of expression. *Id.* In *Thornburgh*, the Court had to determine the constitutionality of a prison regulation that permitted the warden to reject incoming publications that described the construction or use of weapons, methods of escape, procedures for making alcoholic beverages or drugs, items written in code, depictions of "activities which may lead to the use of physical violence or group disruption," instruction on the commission of criminal activities, or sexually explicit material. *Id.* at 405. The Court concluded that this regulation passed the second step of the *Turner* test because the policy still permitted "a broad range of publications to be sent, received, and read. . . ." *Id.* at 418.

*Monroe v. Beard*, No. 05-04937, 2007 WL 2359833, *18 (E.D. Pa. Aug. 16, 2007); *see also Turner*, 482 U.S. at 81 (finding that regulation that prohibits communication between inmates at different prisons does not deprive inmates of all means of communication). Viewed expansively, the right at issue in this case is Plaintiff's right to the free flow of his outgoing mail. Plaintiff does not suggest that either the regulation or Defendants' actions interfered with anything but his ***one envelope addressed to the IRS***.[16] Accordingly, the regulation itself, and Defendants' actions pursuant to it, limited as they were, pass the second step of the *Turner* test because Defendants did not otherwise curtail Plaintiff's right to send outgoing mail. In other words, Defendants did not deprive Plaintiff of ***all*** of his outgoing mail privileges; they only prohibited him from sending ***one piece of mail***.

Defendant Taylor has stated that he knew of at least ten other inmates attempting to file false or fraudulent tax forms with the IRS. *See* Taylor Aff. at ¶ 9. Plaintiff testified that he decided to submit the forms because he believed that another inmate had been successful in getting a large amount of money by submitting similar forms. *See* Plaintiff's Deposition Transcript at 62-65.

---

[16] When discussing interference with **legal** mail, "[t]he Second Circuit has clearly held that an isolated incidence [sic] of interference with a prisoner's mail does not give rise to a cognizable claim under § 1983." *Govan v. Campbell*, 289 F. Supp. 2d 289, 297-98 (N.D.N.Y. 2003) (citation omitted).

Failure to stop what Defendant Taylor believed to be "an inmate conspiracy developing at GCF," *see* Taylor Aff. at ¶ 9, could have an adverse impact on the other inmates, perhaps encouraging them to also file similar documents with the IRS.  *See, e.g. Turner*, 482 U.S. at 90 (holding that, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials" (citation omitted)).

    In considering whether easy alternatives to the restriction exist, the Court notes that, "for an inmate regulation to be valid, 'prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating' a prisoner's alleged needs." *Johnson v. Goord*, 445 F.3d 532, 535 (2d Cir. 2006) (quoting *Turner*, 482 U.S. at 90-91, 107 S. Ct. 2254).  Here, Plaintiff suggests that, as an alternative to opening his mail, Defendants should have allowed him to send his mail to the IRS who was in a better position to judge the fraudulent nature of Plaintiff's return.  *See* Dkt. No. 31 at 11.  Although the Court agrees that this was a choice that Defendants could have made, because the Court is required to defer to decisions that prison administrators make, and recognizing the intense pressure that prison administrators are under to encourage rehabilitation and prevent further criminal acts by those under their charge, no reasonable juror could conclude that the alternative that Defendant Taylor selected was unreasonable.  In fact, a reasonable juror could conclude that preventing suspected government fraud at the outset was abundantly reasonable and the only logical choice.

    In this case, Defendant Taylor opened Plaintiff's one piece of mail based on information that credible sources had provided as well as upon Defendant Taylor's prior experience with a similar tax fraud scheme at another correctional facility.  Therefore, based on the record, Defendant Taylor did

not violate Plaintiff's First Amendment rights as the penological interest of preventing suspected

criminal activity established good cause to open the mail.

Plaintiff, however, asserts that Defendant Taylor violated DOCS Directive 4421 because he

did not authorize the opening of Plaintiff's privileged mail **in writing**.  *See* Dkt. No. 31 at 12.  In

support of this argument, Plaintiff states that he attempted to obtain a copy of this written

authorization to no avail.  *See id*. at 12, 24-28.  Although Defendant Taylor states that he "prepared

an authorization to open the suspected envelopes," *see* Taylor Aff. at ¶ 14, Defendants failed to

produce such authorization with their motion.  Nevertheless, the fact that Defendant Taylor might

have violated a procedure set forth in the state regulation does not amount to a constitutional

violation and cannot support a claim pursuant to § 1983.  *See Rivera v. Wohlrab*,  232 F. Supp. 2d

117, 123 (S.D.N.Y. 2002) (holding that, "[r]egardless of any alleged violations of internal

regulations, the law is settled that the failure to follow a DOCS Directive or prison regulation does

not give rise to a federal constitutional claim" (citation omitted)).


### 2. Fourth Amendment

Although the parties do not address this issue, construing Plaintiff's complaint liberally, he

may also allege that Defendants violated his Fourth Amendment rights when they opened and

confiscated his outgoing mail.  "The fact of arrest and incarceration abates all legitimate Fourth

Amendment privacy and possessory interests in personal effects."  *Hudson v. Palmer*, 468 U.S. 517,

538 (1984) (O'Connor, J., concurring) (citations omitted).  Moreover, "the interception of [an

inmate's] correspondence does not violate that individual's First or Fourth Amendment rights if

prison officials had 'good' or 'reasonable' cause to inspect the mail."  *Felipe*, 148 F.3d at 108 (citation

omitted).  This is because "the investigation and prevention of illegal activity among inmates is a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner."  *Id*. (citation omitted)

Even if the Court were to find that the Fourth Amendment protects an inmate's mail from unreasonable searches and seizures, as more fully discussed above, because an inmate's constitutional rights are not absolute, they must give way to legitimate penological interests.  *See Workman*, 80 F.3d at 699.  The Court has already concluded that Defendants' actions with respect to Plaintiff's mail were reasonably related to a legitimate penological interest.  In light of this, even if Plaintiff could assert Fourth Amendment protections for his mail, that right would yield to the demonstrated legitimate penological interests of preventing suspected criminal activity.  Thus, the Court grants Defendants' motion for summary judgment with respect to any Fourth Amendment claim that Plaintiff may have asserted.

## C.    Due process

### 1. Vague rules

Plaintiff claims that Defendants Nocera and Leconey denied him due process, respectively, because the rules under which he was charged and disciplined were unconstitutionally vague.  *See* Complaint at ¶ 7; *see also* Dkt. No. 31 at 15.  Plaintiff was charged and found guilty of violating Rule 103.20 ("Soliciting") and Rule 107.20 ("Misleading / False Statements").  *See* Nocera Aff. at ¶ 17; Reusner Aff., Exhibit "K" (Plaintiff's Misbehavior Report).  Rule 103.20 states that "[a]n inmate shall not request or solicit goods or services from any business or any person other than an immediate family member without the consent and approval of the facility superintendent or

designee." *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2, Rule 103.20.  Rule 107.20 provides

that "[a]n inmate shall not lie or provide an incomplete, misleading and/or false statement or

information." *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2, Rule 107.20.  A person of ordinary

intelligence would understand these rules; and, therefore, no reasonable juror could conclude that the

rules are vague on their face.

Plaintiff also claims that the rules are vague as applied to his conduct.  *See* Dkt. No. 31 at 15-

16.  The Second Circuit has "approved a two-prong test for determining whether a prison rule is

unconstitutionally vague as applied: '[A] court must first determine whether the statute gives the

person of ordinary intelligence a reasonable opportunity to know what is prohibited and then

consider whether the law provides explicit standards for those who apply it.'"  *Farid v. Ellen*, 593

F.3d 233, 240 (2d Cir. 2010) (quotation omitted); *see also Giano*, 54 F.3d at 1057 (holding that "[a]

statute is unconstitutionally vague if persons of common intelligence must necessarily guess at its

meaning and differ as to its application . . . or if it fails to give a person of ordinary intelligence fair

notice of conduct proscribed or required by the regulation . . . and encourages arbitrary and erratic

behavior on the part of officials charged with enforcing the rule " (internal citations omitted)).

The rules at issue plainly proscribe (1) seeking money from sources outside the prison (other

than from family members) without first obtaining permission from the superintendent or his

designee and (2) making false or misleading statements.  A person of ordinary intelligence would

readily understand that, in asking the IRS to send him $144,500,00.00, he is seeking money from

someone other than a family member and that, therefore, the request would require the permission of

the superintendent or his designee.  Although Plaintiff argues that the IRS is not a person or

business, the Court points out ***that the IRS is also not a family* member**.  A person of ordinary

intelligence would also readily understand that requesting a $144,500,000.00 refund on income that the person could not possibly have earned would amount to making a false or misleading statement. In fact, at his Tier III hearing, when asked if he had appearance bonds in the amount claimed, he replied, "No." *See* Dkt. No. 28-17 at 8. In essence, Plaintiff confirmed that he made a false or misleading statement. Also, a person of ordinary intelligence would reasonably conclude that failing to mention that he was incarcerated during the time he allegedly accumulated $144,500,000.00 in income would be misleading. Finally, in light of Plaintiff's actual conduct, the rules were not vague as applied. The record demonstrates that Plaintiff's tax forms were consistent with a known tax scam. The Court finds that no reasonable juror could conclude that the regulations in question, as applied to Plaintiff's actions, were unconstitutionally vague.

Ancillary to his vagueness arguments is Plaintiff's claim that Defendants violated New York State Correction Law § 138 (Institutional Rules and Regulations for Inmates at all Correctional Facilities) because the disciplinary rules he was charged with violating did not give him sufficient notice that he could be punished for filing tax returns. *See* Complaint at ¶ 7; *see also* Dkt. No. 31 at 14-15. However, "a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law; rather, in order to prevail on a § 1983 claim, the allegations asserted must constitute violations of constitutional due process standards."[17] *Rivera*, 232 F. Supp. 2d at 123 (citation omitted).

---

[17] The Court has already concluded that the rules and their application to Plaintiff did not violate due process.

### 2. Misbehavior report/disciplinary hearing

Construed liberally, Plaintiff's complaint may allege that Defendants denied him procedural

due process at his Tier III hearing. *See* Complaint at ¶¶ 6-7. In response to Defendants' summary

judgment motion, Plaintiff alleges that the misbehavior report that Defendant Nocera issued was

defective and therefore denied Plaintiff due process. *See* Dkt. No. 31 at 17. Plaintiff also claims that

Defendant Leconey was not impartial and had pre-determined the outcome of Plaintiff's Tier III

hearing. *See id.* at 16.

To successfully establish a due process claim under 42 U.S.C. § 1983, a plaintiff must show

both the existence of a protected liberty interest and that he was deprived of that interest without

being afforded sufficient process. *See Sandin v. Conner*, 515 U.S. 472, 483-85 (1995). In *Sandin*,

the Supreme Court determined that a protected liberty interest from restrictive confinement will

generally be limited to freedom from restraint that imposes an "atypical and significant hardship on

the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *see also*

*Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000) (quotation omitted); *Hynes v. Squillace*, 143 F.3d

653, 658 (2d Cir. 1998) (per curiam) (quotation omitted). The "atypicality" inquiry under *Sandin* is

normally a question of law. *See Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v.*

*Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). In making that determination, the court must consider the

specific circumstances of the confinement, including both the duration and the conditions thereof.

*See Colon*, 215 F.3d at 230; *Sealey*, 197 F.3d at 585.

The duration of the challenged confinement, while not determinative, is a significant factor

under *Sandin*. Courts have consistently held that SHU or keeplock confinement under ordinary

conditions for periods similar to what Plaintiff experienced do not rise to a level sufficient to

establish a due process claim.  *See Anderson v. Beaver*, 455 F. Supp. 2d 228, 230 (W.D.N.Y. 2006)

(holding sixty-day SHU confinement insufficient to raise due process concerns when there is no

showing that conditions of confinement rose to the level of an "atypical and severe hardship"); *Farid*

*v. Ellen*, No. 01 Civ. 8292, 2006 WL 59517, *6 (S.D.N.Y. Jan. 11, 2006) (holding ninety-day SHU

confinement with no evidence that confinement in SHU was more severe than normal or in any way

atypical does not implicate due process); *see also Colon*, 215 F.3d at 231 (wherein the Second

Circuit suggested that normal SHU confinement of 101 days or less does not constitute an atypical

and significant hardship under *Sandin*).

There is no evidence in the record to suggest that Plaintiff ever filed any complaints about the

conditions in SHU.  Moreover, Plaintiff's complaint is utterly devoid of any allegations that his

confinement in SHU imposed an atypical and significant hardship on him in relation to the ordinary

incidents of prison life.  Upon due consideration, the Court finds that Plaintiff's SHU confinement

for a period of sixty days under conditions that he does not claim were unusual or atypical does not

state a legally cognizable liberty deprivation under *Sandin.*  Therefore, Plaintiff cannot assert due

process violations growing out of the issuance of the misbehavior report or the resulting disciplinary

hearing.

However, even if Plaintiff could establish that his sentence implicated a liberty interest, the

Court would still dismiss his due process claims against Defendants Nocera and Leconey with

respect to the misbehavior report and the subsequent disciplinary hearing because Plaintiff received

all the process that he was due.  Plaintiff first argues that he was denied due process because he

received insufficient notice of the charges against him because the misbehavior report that Defendant

Nocera issued "was defective" as it did not "specify the particulars of the alleged incident of the

misbehavior involved" but only stated that "Plaintiff filed a fraudulent U.S. Income Tax Return 1040 without stating what was fraudulent." *See* Dkt. No. 31 at 17.  However, the Court finds that no reasonable juror could conclude that a misbehavior report citing specific disciplinary rules and stating that Plaintiff had attempted to file a false tax return was insufficient notice of the charges against him.  Moreover, as long as prison officials grant the inmate a hearing and an opportunity to be heard, the "'filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983.'"  *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (quoting [*Freeman v. Rideout*, 808 F.2d 949,] 953 [(2d Cir. 1986)]).  Plaintiff was afforded a hearing and an opportunity to be heard.  *See* Dkt. No. 28-17.

Plaintiff also claims that the Tier III hearing itself was defective because Defendant Leconey was biased, as she had been involved in the underlying investigation of the conduct charged and had pre-determined the outcome of the hearing before it was held.  *See* Dkt. No. 31 at 16.  Plaintiff rests this claim on the fact that (1) Defendant Leconey was present at an Inmate Liaison Committee meeting on January 30, 2008, where Defendant Taylor informed the committee of an ongoing investigation into possible tax scam at GCF and (2) Defendant Leconey was Deputy of Security so it would be likely that she would be part of the investigation.  *See* Dkt. No. 28-28, Plaintiff's Deposition Transcript at 58-60.  Plaintiff's conclusory statements in this regard present no evidence whatsoever that would convince a reasonable juror that Defendant Leconey was involved in the underlying investigation into Plaintiff's alleged attempt to file false tax returns.  Moreover, although the Second Circuit has recognized that due process requires a prison disciplinary hearing to be impartial, *see Russell v. Selsky*, 35 F.3d 55, 59 (2d Cir. 1994), it has

also recognized that "the special characteristics of the prison

-33-

> environment [make] it . . . possible for the impartiality of [hearing
> officers] to be encumbered by various conflicts of interest that, in other
> contexts, would be adjudged of significant magnitude to violate due
> process." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989) (citing
> *Cleavinger v. Saxner*, 474 U.S. 193, 203-04 (1985)).  For example, the
> Court affirmed the grant of summary judgment dismissing a section
> 1983 claim by an inmate who challenged a hearing officer's dual status
> as the officer reviewing the initial IMR and serving as the hearing
> officer, given the absence of both a clearly established right and any
> evidence of actual bias.  *See Russell*, 35 F.3d at 60.

*Farid*, 2006 WL 59517, at *7.

Plaintiff also argues that Defendant Leconey was biased because she decided the outcome of the hearing before it took place. *See* Dkt. No. 31 at 17; *see also* Dkt. No. 28-28, Plaintiff's Deposition Transcript at 49-52.  The mere fact that Defendant Leconey may have given **similar sentences** to the other inmates charged with **identical disciplinary infractions** provides no evidence that would persuade a reasonable juror to conclude that the outcome of the hearing was pre-determined.  Instead, it is likely that a reasonable juror would conclude that Defendant Leconey meted out comparable sentences simply **because the disciplinary charges were identical**.

Finally, in *Wolff v. McDonnell*, the Supreme Court enumerated certain procedural safeguards that prison officials must afford to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied.  *See Wolff v. McDonnell*, 418 U.S. 539 (1974).  Specifically, an inmate charged with a violation must be given (1) advance written notice of the claimed violation or charges at least twenty-four hours before the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) a written statement by the factfinder of the evidence relied upon and the reasons for the disciplinary action taken.  *See id.* at 564-66.

On February 1, 2008, well before the February 11, 2008 Tier III hearing, Plaintiff was given advance written notice of the charges against him. *See* Nocera Aff. at ¶¶ 17-18; *see also* Reusner Aff., Exhibit "K" (Plaintiff's Misbehavior Report). Plaintiff appeared at the hearing and was given the opportunity to call and question witnesses and to testify on his own behalf. *See* Dkt. No. 28-17, Tier III Transcript. At the conclusion of the hearing, on February 13, 2008, Plaintiff was given a written statement as to the evidence upon which Defendant Leconey relied in making her decision. *See* Dkt. No. 28-21 at 9-10. The due process that Defendants provided to Plaintiff meets or exceeds the minimum requirements set forth in *Wolff*; therefore, Defendants did not violate his constitutional rights. "Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the prison disciplinary board." *Freeman v. Rideout*, 808 F.2d 949, 954-55 (2d Cir. 1986) (citations omitted). After reviewing the record evidence, a reasonable juror could conclude that Defendant Leconey's decision at the end of the Tier III hearing was supported by some evidence.[18]

Based upon all of the foregoing, the Court grants Defendants' motion for summary judgment and dismisses Plaintiff's procedural due process claims against Defendants Nocera and Leconey.

### 3. Failure to correct on appeal

Although Plaintiff did not allege in his complaint that Defendants Fischer and Taylor, after

---

[18] Plaintiff argues that Defendant Leconey's decision is infirm because she relied on a statement that IRS Agent Ewald made in finding Plaintiff guilty of attempting to file false or fraudulent tax forms without first assessing Agent Ewald's credibility. *See* Dkt. No. 31 at 19. Plaintiff's claim in this regard fails because Defendant Leconey's written decision indicates that she only relied on the testimony of Defendant Nocera and Plaintiff's tax forms in reaching her decision. *See* Dkt. No. 28-21 at 10.

being advised of the due process violations that occurred at Plaintiff's February 2008 Tier III hearing, failed to correct them on appeal, he did make this claim in response to Defendants' motion for summary judgment. *See* Dkt. No. 31 at 21.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)) (other citations omitted).  In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1980).  If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command," i.e., under the doctrine of *respondeat superior*, is insufficient to show his personal involvement in that unlawful conduct. *See Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (citations omitted); *Wright*, 21 F.3d at 501 (citations omitted).  Supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *See Colon*, 58 F.3d at 873 (citation omitted).

Clearly, Plaintiff's claim against Defendants Fischer and Taylor falls squarely under the second *Colon* factor.  The record demonstrates, however, that Norman R. Bezio addressed Plaintiff's appeal from the February 2008 Tier III hearing. *See* Dkt. No. 28-32.  Despite this, Plaintiff argues

-36-

that Defendant Fischer is still liable for failing to correct the alleged due process violations because Plaintiff addressed his letter of appeal to Defendant Fischer. *See* Dkt. No. 28-28, Plaintiff's Deposition Transcript at 27. However, "[w]here a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action." *Liner v. Goord,* 310 F. Supp. 2d 550, 555 (W.D.N.Y. 2004) (citations omitted); *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir. 1997) (affirming summary judgment where commissioner referred the plaintiff's letter to the prison superintendent); *Garvin v. Goord,* 212 F. Supp. 2d 123, 126 (W.D.N.Y. 2002) (granting summary judgment to DOCS commissioner based on lack of personal involvement); *Farid v. Goord,* 200 F. Supp. 2d 220, 235 (W.D.N.Y. 2002) (dismissing action against DOCS commissioner and prison superintendent for lack of personal involvement where plaintiff merely sent petition to them and each referred the petition down the chain of command for investigation).

For these reasons, the Court grants Defendants' motion for summary judgment and dismisses Plaintiff's claim against Defendants Fischer and Taylor in this regard because no reasonable juror could conclude that either of these Defendants was personally involved in Plaintiff's appeal from the February 2008 Tier III hearing.


**D.      Qualified immunity**

In the alternative, Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's claims that they searched and confiscated his mail in violation of the First and Fourth Amendments and denied him due process in violation of the Fourteenth Amendment. In determining whether qualified immunity applies, the court may first consider whether "the facts

alleged show the [defendant's] conduct violated a constitutional right[.]"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, --- U.S. ---, 129 S. Ct. 808, 818 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").  The Court may also examine "whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition[.]"  *Id.*  However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Id.*  Since the Court has concluded that no First, Fourth, or Fourteenth Amendment violations occurred, the Court need not address qualified immunity.


## IV. CONCLUSION

After carefully reviewing the entire file in this action, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** and Plaintiff's complaint is **DISMISSED IN ITS ENTIRETY with prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 29, 2010
      Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge

-38-